**Arthur J. KRAUS, Appellant,**

v.

**John Foster DULLES, Secretary, Department of State, Appellee.**

**No. 12820.**

United States Court of Appeals District of Columbia Circuit.

Argued March 21, 1956.

Decided July 5, 1956.

Mr. Stanley Suydam, Washington, D. C., for appellant.

Mr. Frank H. Strickler, Asst. U. S. Atty., with whom Messrs. Leo A. Rover, U. S. Atty., at the time case was argued, and Lewis Carroll, Asst. U. S. Atty., were on the brief, for appellee.

Before PRETTYMAN, BAZELON and WASHINGTON, Circuit Judges.

WASHINGTON, Circuit Judge.

Plaintiff-appellant seeks a passport to travel abroad. Failing to obtain favorable action by the State Department on his application, he brought this suit in the District Court for declaratory and mandatory relief. The District Court granted appellee's motion to dismiss for failure to state a claim on which relief may be granted. This appeal followed.

Appellant says that the purpose of his proposed trip is to gain backing in his effort to submit what he denominates the Kraus Case to the U. N. Commission on Human Rights. The Kraus Case appears to be appellant's protest against his dismissal in 1933, for reasons which do not appear in this record, from the faculty of the City College of New York. To this effort appellant has devoted most of his energies since 1933, and his gainful employment has been intermittent since that time. He is without funds or property, and is dependent upon contributions from sympathizers and from charitable organizations; he has on at least one occasion also been supported by a public welfare agency.

There is some doubt as to the circumstances of a previous controversy between appellant and the State Department. The Department asserts only that appellant required the financial assistance of the Department to the extent of $95 in securing return transportation to the United States from Costa Rica in 1951, and that he has not repaid this money. Appellant asserts that he was about to depart Costa Rica for Panama when an American consular official in Costa Rica took away his passport on the ground his presence was undesirable, and would give it back only to permit direct return to the United States. Appellant states that he had prospects of receiving remuneration for lectures in Panama, and that he became destitute and had to accept the State Department's offer of funds to return him to the United States only because of the Department's action in taking away his passport and thus forcing his return.

Subsequent to his return, appellant's passport was renewed for six months, but only after he had been required to submit and did submit evidence of his financial ability to travel, the evidence consisting of a bank deposit of $1,000 derived from contributions.

In 1954 appellant made the passport application which is the basis for the present suit. The State Department advised him that it took no position on the Kraus Case, and that it had no objection to his traveling abroad for the purpose of gaining support for his case. However, the Department declined to issue appellant a passport unless he could show that he had the necessary funds with which to travel abroad and return home, or a means of obtaining such funds which had reasonable assurance of success. The Department also expressed displeasure at the fact that appellant's past travels had caused "Foreign Service offices of the United States to receive numerous troublesome and vexatious inquiries" about appellant's activities. Appellant declined to make the submissions requested and instead brought this action in the District Court.

It is clear that the denial of a passport by the Secretary of State is subject to a measure of judicial review, including the question whether the action of the Secretary was arbitrary or capricious or contrary to law. Perkins

v. Elg, 1939, 307 U.S. 325, 59 S.Ct. 884, 83 L.Ed. 1320; Shachtman v. Dulles, 1955, 96 U.S.App.D.C. 287, 225 F.2d 938; Boudin v. Dulles, 1956, 98 U.S.App.D.C. —, 235 F.2d 532. We think that in the instant case there is sufficient likelihood that the reason given represents arbitrary and capricious action to render the grant of appellee's motion to dismiss— before answer and before hearing—unjustified.[1] In the instant case, some officials of the Department of State indicated in their correspondence with appellant that the Department has a long-standing policy "that it is not favorably disposed to issue passport facilities to persons who appear likely to require financial assistance in accomplishing their proposed travels abroad." And a State Department official has testified before a Senate Subcommittee that some 120 passport applicants were screened on a financial basis during the ten months period from January 1 until October 30, 1955, with a resultant 25 rejections for financial reasons.[2] On the other hand, appellant's attorney in the District Court submitted an affidavit that he had been advised by the State Department that no requirement relative to money or property was ever made of a passport applicant, and that in fact no such requirement had been made in appellant's case. And an examination of the extensive regulations of the President and of the Secretary of State relating to the issuance of passports, 22 C.F.R. Pts. 51–53, shows no evidence of the existence of any such policy. It is clear from the questions required to be answered on passport applications that there is not the slightest effort to screen the great majority of passport applicants on a financial basis. It thus is quite possible, from the record as it now stands, that the State Department has applied to appellant a test it does not apply generally to passport applicants, and that this has been done without the establishment of any reasonable classification which could justify such discrimination. If such action has occurred, it is arbitrary and capricious and must be set aside on judicial review. Mastrapasqua v. Shaughnessy, 2 Cir., 1950, 180 F.2d 999; Hyman v. Coe, D.C.D.C.1952, 102 F.Supp. 254.

We are reinforced in our view that dismissal was not justified because the establishment of a means test for passport applicants, particularly at a time when a passport is required for most foreign travel, 8 U.S.C.A. § 1185; 18 Fed.Reg. 489 (1953), would obviously raise serious constitutional questions. These ought not to be passed on in the present unsatisfactory state of the record as to what the State Department's policy is and how it is applied, compare Naim v. Naim, 1955, 350 U.S. 891, 76 S.Ct. 151; Rescue Army v. Municipal Court, 1947, 331 U.S. 549, 67 S.Ct. 1409, 91 L.Ed. 1666, particularly since there is the non-constitutional ground suggested above which may possibly be decisive. Accordingly, the order of the District Court must be vacated and the case remanded for further proceedings not inconsistent with this opinion.

So ordered.

PRETTYMAN, Circuit Judge (dissenting).

In a sworn statement made to the State Department in 1951 Kraus stated, *inter alia:*

"My last employment was during 1945 when I was engaged in selling the Encyclopedia Britannica. I was then employed by the trade office of

1. Appellee urges that we treat the action of the District Court as in effect the granting of appellee's motion for summary judgment rather than the granting of its motion to dismiss. We consider that the reasons hereinafter set forth as to why the dismissal was erroneous show with equal force that summary judgment for appellee would be incorrect.

2. Hearings, Subcommittee on Constitutional Rights, Senate Committee on the Judiciary, 84th Cong., 2d Sess., pursuant to S.Res. 94, pp. 162–63 (1955).

Encyclopedia Britannica, Palms Building, Woodworth Avenue, Detroit for one year; from then until 1949 I was supported by the Department of Public Welfare of Detroit.

\* \* \* \* \* \*

"A. I have no property or funds at all.

\* \* \* \* \* \*

"A. I have been supported in the United States of America, by charitable institutions and sympathizers; while I have been abroad I have been supported by government contributions, by statesmen, civic leaders and different churches.

"[Q] Have you made any effort to secure the necessary funds for your return to the United States? "A. No.

\* \* \* \* \* \*

"[Q.] What is the occupation of your brother, Marek Kraus?

"A. He is the owner of a money lending house.

"[Q] Approximately what are his assets?

"A. I would say that he would be worth approximately $500,000.00.

"[Q.] Are your relatives in the United States financially in a position to furnish you the necessary funds with which to return to the United States?

"A. The only one who would be able is this man, Marek Kraus, who is definitely committed not to help me. He financed my studies at Oxford and since then he has refused to furnish me anything.

"[Q.] Is it not possible that some of your other relatives in the United States might be willing to contribute the necessary funds for your return to the United States?

"A. None of the relatives would take any responsibility for me.

"[Q.] In the event that the Department of State at Washington should be in a position to make you a loan of the necessary funds for your return to the United States, would you be in a position to repay such loan?

"A. No, at least not until I have a livelihood because I will have to go on relief when I return to the United States."

It is also a fact that Kraus became destitute while abroad in 1951 and was returned home at the expense of the Government.

In March, 1954, Kraus made an application (the one now before us) for a passport to travel in all the countries of the free world, listing twenty-eight countries, for the purpose of collecting petitions to the Commission on Human Rights of the United Nations in respect to the "Kraus Case". That "Case" concerned Kraus's removal from the faculty of the City College of New York in 1933.

A State Department official explained to the attorney for Kraus that the sole objections to issuance of a passport were (1) that he (Kraus) had been destitute in Costa Rica (in 1951) and (2) that his method of procuring a living in foreign countries had been embarrassing to the foreign service people. Kraus was advised by letter:

"With reference to the foregoing, the Department desires to make clear that its position with respect to your application for a passport is predicated upon a long-established policy of endeavoring to require that at least a minimum of precaution is observed to insure that American travelers proceeding abroad have taken reasonable measures to conduct their travels without being forced to call upon this government for assistance in ordinary circumstances. As has been pointed out to you, the Department would have no objection to your proceeding abroad for your avowed purpose, but experience has shown that your methods of obtaining financial back-

ing for your cause, and indeed the means for securing the essentials of your livelihood; have proved embarrassing to the United States Foreign Service offices in the countries in which you have traveled."

And in another letter Kraus was told: "The Department has previously called to your attention the fact that it is not favorably disposed to issue passport facilities to persons who appear likely to require financial assistance in accomplishing their proposed travels abroad."

In an affidavit in the record a legal assistant in the Passport Office swore that he informed counsel for Kraus "that it was the long standing requirement of the Department, in the case of an application for a passport 'where there was reason to believe the applicant might become financially destitute abroad, to require assurances that reasonable precautions had been taken to defray his expenses of travel abroad. It was pointed out that the requirement was based upon considerations of the best interests of this Government in the conduct of its affairs abroad."

The premise for the Secretary's ruling was not the financial worth of Kraus. The premise was the sum total of the facts concerning Kraus's manner of supporting himself while abroad, depending upon charitable handouts; his total lack of resources, direct or indirect, whereby he might have some assurance of being able to return home; and the fact that he had lived on relief or on charity for some years. The conclusion of the Secretary was that upon those facts it was not in the best interests of this country to have Kraus traveling abroad. The financial-showing provision was an escape clause, a means whereby Kraus might extricate himself from the predicament in which the whole of his history and circumstances placed him. I see nothing arbitrary or capricious in the Secretary's determination

that to let a man in the condition depicted in Kraus's affidavit travel abroad under the *aegis* of a United States passport is not consistent with the best interests of this country. He ruled on this particular case, and I find little to quarrel with in his ruling.

The point can be made clear by reversing, *arguendo,* the situation. Suppose France, Italy, or some other country knowingly issued passports to panhandlers for the purpose of letting them travel around this country, begging their way. Would such a practice be to the best interests of the country issuing the passport? Obviously not, I think.

A contention is vigorously pressed upon us that affirmance of this case would establish a rule that the Secretary can grant or deny passports upon a measurement of the financial worth of applicants. The Secretary is proposing no such rule. Certainly I would not agree to such a rule. We have one factual situation before us. The Secretary dealt with that one factual situation, and we should deal with the case on that basis.

I am of opinion the Secretary of State has a measure of discretion in the issuance of passports. Foreign relations are involved, and such relations lie largely within the good judgment of the executive branch. In Shachtman v. Dulles we said:

> "For reasons thus suggested the issuance of passports throughout our history has been left to the judgment of the Secretary of State under Presidential regulation, and is subject only to constitutional safeguards. And even these must be defined with cautious regard for the responsibility of the Executive in the conduct of foreign affairs." [1]

The ground upon which the Secretary acted in the case at bar seems to me to be both rational and reasonable.

I would affirm the order of the District Court.

1. 1955, 96 U.S.App.D.C. 287, 291, 225 F.2d 938, 942.